SUPREME COURT. New York General Term, October, 1859. *Roosevelt, Clerke* and *Sutherland,* Justices.

FELIX SANCHEZ, plaintiff in error, *v.* THE PEOPLE, defendants in error.

In an indictment for murder, it was charged that the mortal wound was given by stabbing with a sword "in and upon the body" of the deceased: *Held,* sufficient, without specifying the part of the body upon which the wound was inflicted.

Where the indictment alleged that the deceased was killed by "one mortal wound," and the proof showed that two were given, the variance was held to be immaterial.

On the trial of a challenge for favor, the person challenged as a juror testified that he "had read part of the statements in the papers at the time of the homicide, and had formed a preconceived idea in regard to the prisoner's guilt or innocence; that he had no bias one way or the other; that his preconceived idea or impression would in no way influence his verdict, but would be governed entirely by the evidence produced on the stand." He was adjudged to be a competent juror.

It is not competent for a party calling a witness, to ask him whether he had not previously made a certain statement on oath before the coroner's inquest, the alleged statement being repeated in the question, and differing from the testimony of the witness on the trial.

On the trial of an indictment charging the prisoner with the murder of his father in-law, it was proposed, in behalf of the prisoner, to prove that communications had been made to him, at some time before the alleged murder, notifying him of the infidelity of his wife, which evidence was offered for the purpose of authorizing the inference that the act was committed under the influence of an "insane frenzy:" *Held,* that the evidence was incompetent, and was properly excluded.

*Homicidal mania* and its exciting causes and premonitory symptoms described by physicians.

THE prisoner was indicted for the murder of Harmon Curnon. The indictment contained one count, charging "that the said Felix Sanchez, with a certain sword, which he, the said Felix Sanchez, in his right hand then and there had and held, the said Harmon Curnon, in and upon the body of him, the said Harmon Curnon, then and there willfully and feloniously, and of his malice aforethought, did stab, cut and wound; giving unto the said Harmon Curnon, then and there, with the sword afore-

said, in and upon *the body* of him, the said Harmon Curnon, *one* mortal wound of the breadth of one inch, and of the depth of three inches, of which said mortal wound he, the said Harmon Curnon, at the ward, city and county aforesaid, then and there instantly died."

The prisoner pleaded "not guilty," and the issue thus joined was tried at a Court of General Sessions in the city of New York, before *Abraham D. Russell*, City Judge, in June, 1859.

After several jurors had been called, and either sworn to try the cause, or set aside upon challenges for principal cause, or for favor by the prisoner, John S. Tuthill was called as a juror, and appeared, and was challenged for principal cause on the part of the prisoner, and the challenge denied by the counsel for the People; the said John S. Tuthill having been sworn to testify the truth as to his competency as a juror, testified that he had not formed or expressed any opinion as to the guilt or innocence of the accused, whereupon the challenge for principal cause was overruled. The counsel for the prisoner then challenged him for favor, and it was agreed by and between the counsel for the prisoner and the counsel for the People, that the court should act as trier. The said John S. Tuthill thereupon testified that he had read part of the statements in the papers at the time of the homicide, and had formed a preconceived idea in regard to the prisoner's guilt or innocence; that he had no bias one way or the other; that his preconceived idea or impression would in no way influence his verdict, but would be governed entirely by the evidence produced on the stand. The court found said challenge for favor untrue, and overruled the same, to which decision the counsel for the prisoner excepted.

The following are the principal facts proved in the case:

The prisoner was married to the daughter of the deceased on the 18th of November, 1858. They boarded for five weeks after the marriage, with Mrs. Petrona Saunders, in Grand street, New York, and afterwards with the family of the deceased. On the afternoon of January 4th, 1859, the prisoner went to Mrs. Saunders, and procured a sword-cane he had left at her

house. He pulled out the sword and rolled it up in paper, and took the cane in his hand, saying he was going to have it fixed in Laurens street. On the evening of January 5th, the prisoner and his wife took tea at home, and then went to the house of Mrs. Saunders. They arrived there between six and seven, and soon afterwards the prisoner went out, leaving his wife there. He returned at half-past ten, and after a short time left with his wife; they arrived home at about that time; they went in at the basement door, into the kitchen, where part of the family of the deceased were together; the prisoner's wife went immediately up stairs, and the prisoner followed her in five minutes afterwards; the deceased came in soon afterwards with some apples, which his niece, Maria Johnson, put on a plate and took up stairs to a room occupied by the deceased and his wife as a bedroom, which was also used as a parlor; the prisoner and his wife slept in a small room which was entered through that room, and which was lighted from the entry by a small window; the prisoner and his wife, her younger sister Martha, and Maria Johnson, remained together in the parlor until half-past twelve o'clock, singing songs, playing upon the guitar, and eating apples; Maria Johnson and Martha Curnon then returned to the kitchen, where the deceased and his wife were nodding by the fire, the latter having been ironing; and the girls then went up to bed in the attic of the house; the last they heard of the prisoner he was singing and whistling.

About two o'clock the deceased and his wife went up to go to bed, and found the door of their room locked. Mrs. Curnon looked through the entry window into the prisoner's room, and saw him standing there. She asked him three times to open the door, but he made no answer. She then asked her daughter, who was sitting up in bed, to open the door, who replied, " He won't let me." The mother then forced open the door of the outer room, and as she entered it, the prisoner rushed out of the bedroom and stabbed her with the sword he had procured from the house of Mrs. Saunders. His wife then jumped out of bed and escaped up stairs, the prisoner stabbing

her in the shoulder as she passed. The prisoner then turned upon the deceased, and stabbed him with the sword-cane—the weapon being entirely or partially withdrawn, and immediately pushed in again, so as to make really two wounds together, showing a cruciform cut on the outside. The wounds were such as to cause instantaneous death. The mother also escaped up stairs pursued by the prisoner, and she and the prisoner's wife, and Maria Johnson, fastened themselves in the garret. The prisoner had forced the door partially open, when Martha Curnon, who had gone down stairs during the disturbance, called out from below. The prisoner turned and pursued her, but his light went out, and she hid in the cellar. While there, she heard him say, " Never mind I'll catch you and kill you, and kill myself, too." He remained in the house only some five minutes afterwards, when he left it, went down the alley to the street, slammed the outer gate, returned back into the yard, washed something at the hydrant, and loitered about until near six o'clock in the morning, when he finally left. He escaped from New York, and was subsequently arrested in New Orleans.

When *Annisetto Lajeunechette*, a witness called by the prisoner, was on the stand, the counsel for the prisoner asked him the following question :

*Q.* Did you at any time after the marriage of Sanchez, give him any information of his wife's infidelity to him; and if so, when ?

This question was objected to by the counsel for the People, and the objection sustained, to which decision the prisoner's counsel excepted.

*Sarah Jane Sanchez*, the wife of the prisoner, was called as a witness in his behalf, by consent of the counsel for the People, and after testifying, among other things, that the prisoner had not accused her of having improper intercourse with Lajeunechette, was asked the following question :

*Q.* Did you not state before the coroner, when examined at the inquest, that " last night " (meaning the morning of January 6th), " My husband accused me of having improper intercourse

Sanchez *v.* The People.

with a man named Annisetto Lajeunechette, and threatened that unless I told the truth he would stab me; he accused me of being a prostitute; I was sitting up in the bed crying at the time; my mother knocked at the door on account of his remarks; I heard her burst in the door?"

This was objected to by the District Attorney, and excluded, and the prisoner's counsel excepted.

*Tibulcio Aguillar,* a witness called by the defence, testified, that he saw the prisoner, shortly after the homicide, at his store in New York, and conversed with him about the case.

The prisoner's counsel then asked the following question:

*Q.* "Did he, on that occasion, state to you that he had slept with Mrs. Sanchez on the night of the fifth of January?"

The District Attorney objected, and it was excluded, and the prisoner's counsel excepted.

The prisoner's counsel then asked the following question:

*Q.* Did you ever communicate to Sanchez statements made by Annisetto, or by any other person, in regard to the infidelity of his wife?

This was also objected to by the District Attorney, and excluded, and an exception taken by the prisoner's counsel.

*Benjamin Ogden,* M. D., called on the part of the defence, testified as follows:

I have examined the head of Felix Sanchez; there is a small scar on his head, the result of an incised wound made by some blunt instrument; I found some little thickening of the membrane, which shows that the wound is some six or eight months old; I have made the human mind a special study; there is such a thing as *homicidal mania;* it is an affection of the brain, in which the patient, in a frenzied state, has a desire to commit violence on individuals; the exciting causes are violent emotions of the mind; I would classify extreme jealousy as one of these; there are many cases of this kind in the books; there are cases where *homicidal mania* has been developed suddenly, but generally they show some premonitory symptoms; these are, suspicion, jealousy, vascular excitement, fever, red eyes,

quick pulse, hurried manner; in many cases of insanity, a person's best friends are supposed to be his worst enemies.

On his *cross-examination*, he said: I called at the suggestion of the District Attorney, in company with Dr. Runney; we had interviews of two hours each to examine as to his sanity; the counsel for the prisoner was there at the time; in the course of that examination, I came to the conclusion that he was sane.

Being further examined by the prisoner's counsel, he said: A man who has his reasoning faculties and the control of himself, is sane; I heard the testimony as to the homicide.

*Q.* Judging from your knowledge of Sanchez's temperament, and the facts and circumstances of this case as you have heard them described in the testimony, do you believe that at the time of the homicide Sanchez was mentally capable of forming a premeditated design to take away life?

*A.* I can form no opinion; I have doubts on that subject.

*Moses H. Runney*, M. D., called by the prisoner's counsel, testified as follows: I am resident physician of the Lunatic Asylum at Blackwell's Island; I have heard part of the testimony of Mrs. Sanchez, and of her mother, and of one or two other witnesses; I examined Sanchez on the 6th and 9th of this month, perhaps about three hours; as a general principle, where a homicide has been committed, and it can be determined that there is no motive, I should consider it evidence of *homicidal mania;* but it is extremely difficult to determine the absence of all motive.

*Q.* Judging from your knowledge of Sanchez's temperament, and from the facts and circumstances of this case, as you have heard them described in the testimony, do you believe that at the time of the homicide he was mentally capable of forming a premeditated design to take away life?

*A.* It is a difficult point to decide; if the inception of the idea was immediately followed out, there could of course be no premeditation.

*Q.* Have you doubts as to that subject in this case?

To this question the counsel for the People objected, and the objection being sustained, the counsel for the prisoner excepted.

The witness being *cross-examined*, testified as follows: Dr.
Horwitz was present at the second examination; the prisoner's
counsel was also present, and the Assistant District Attorney
was there during a part of the time; he remained there until
the examination reached a point at which the prisoner's coun-
sel decided to advise his client to answer no further questions
in his presence; he then withdrew; on this examination I
found nothing to convince me of his insanity; I saw no evi-
dence that he ever had been insane.

The jury found the prisoner *guilty*.

The counsel for the prisoner then moved an arrest of judg-
ment on the following grounds, to wit:

1st. That the indictment does not show upon what part of
Harmon Curnon the mortal wound was given.

2d. That there is a variance between the indictment and the
evidence; the indictment setting forth but one mortal wound,
while the evidence shows that there were two.

The court denied the motion; to which decision the counsel
for the prisoner excepted.

Judgment was then pronounced by the court, and the case
was brought to this court by writ of error.

*William Henry Anthon*, for the prisoner.

I. The statute enlarging the jurisdiction of the Court of
General Sessions of the Peace of the city and county of New
York, provides that in all cases of conviction in said court for
a capital offence, or one punishable as a maximum punishment,
by imprisonment for life, a writ of error, with a stay of pro-
ceedings, shall be a matter of right, and that the appellate
court may order a new trial "if it shall be satisfied that the
verdict against the prisoner was against the weight of evidence,
or against law or that justice requires a new trial, whether
any exceptions shall have been taken or not in the court below."
(*Sess. L.*, 1855, *ch.*, *p.* 337, 613.)

II. The indictment is defective in this, that it does not state
on *what part* of the body of Harmon Curnon the mortal wouud

was inflicted, and in this, that there were two mortal wounds, instead of one, as stated.

1. Under the Constitution of the State, a party must be indicted before he can be tried for a criminal offence (with certain exceptions); and under the provisions of the Revised Statutes he is entitled to a copy of the indictment. (*Const.*, § 6, 3*d R. S.*, 1020, 5*th ed.*)

2. The indictment, possession of a copy of which the law deems so essential to the prisoner, must describe the offence charged, in all its essential details, in order that the defendant may clearly understand what he is called upon to answer—may frame his defence accordingly, or may be enabled to plead with accuracy *auterfois acquit* or *auterfois convict.*

3. Where the death was by a wound or stroke, the indictment must show with certainty to what part of the body the violence was applied. (*Hawk. P. C.*, book 2, *ch.* 23, § 82, *p.* 178; 2 *Hale P. C.*, 185, 186; 1 *East.*, 342; *Long's case*, 5*th Co.*, 121, cited in *Hawk.*, 178; 1 *Russ. on Cr.*, book 3, § 678, *p.* 677; 1 *Stark. Cr. Pl.*, 86; 3 *Chitty*, 735; *Whar. on Hom.*, 272; *Arch. C. P.*, 384; *Train & Heard, Prec. of Indict.*, 248; *Whar. Prec., Barb. Cr. L.*, 54.)

4. No omission of any of those circumstances which the law requires to be expressly set forth, can be aided by the conviction of the defendant, and such omission may properly be brought to the notice of the court by a motion in arrest of judgment. (*Hawk. P. C.*, book 2, *ch.* 23, § 86, *p.* 179; *Whar. Cr. L.*, § 3043; 2 *Black.*, 270.)

5. The provisions of the Revised Statutes (3 *R. S.*, 5*th ed.*, 1020, § 4), in regard to defects of *form* in indictments, do not meet this case, this being an error of *substance.* This distinction may be clearly seen by examining the cases of errors of form only. (2 *Seld.*, 50; 3 *Park. Cr.*, 330; 2 *Id.*, 208; 8 *Barb.*, 547; 3 *Id.*, 470; 5 *Denio*, 76; 12 *Wend.*, 425.)

III. The court below erred in overruling the challenge for favor, in the case of the juror, John S. Tuthill, and the exception was well taken.

1. The juror testified that he had read the statements in the papers, and had not formed or expressed an *opinion*, but that he had formed a *preconceived idea* or impression as to the prisoner's guilt or innocence.

2. The fact that he had formed and expressed *an opinion*, would certainly exclude him under the decisions in *Cancemi* v. *The People* (2 *Smith*, 501), *The People* v. *Freeman* (4th *Denio*, 9).

3. A preconceived idea or preconceived impression is even stronger than an opinion, according to the best lexicographers. (*Webster: Idea, impression, opinion.*)

4. The existence of a preconceived idea or impression in the mind, denotes a *prejudiced* state of feeling, disqualifying the juror, under the rule laid down in the Cancemi case, and at variance with the principle there enunciated: "That the testimony as to the juror's state of mind is to be construed with liberality to the defendant, in the humane spirit which pervades our criminal laws, and the rules of their administration." (*The People* v. *Cancemi*, 2 *Smith*, 501.)

IV. The court below erred in not allowing the question to be put to Sarah Jane Sanchez as to the facts to which she had testified before the coroner.

1. The witness was the wife of the prisoner, who was examined by consent; it was supposed that she would swear to the same facts to which she had testified before the coroner, and which would have aided the defence by showing the discovery of her adultery, which produced, as is contended, the insane frenzy under which the prisoner acted; instead of which she swore to a state of facts diametrically opposite, thus taking the defence by surprise.

2. It is competent for a party to prove that a witness whom he has called, and whose testimony is unfavorable to his cause, had previously stated the facts in a different manner. (1 *Greenl. Ev.*, 492; 2 *Bull. N. P.*, 297; *Alexander* v. *Gibson*, 2 *Camp.*, 555; *Lowey* v. *Jolliffe*, *Wm. Blackst.*, 365; *Richardson* v. *Allen*, 2 *Stark. R.*, 334; *Ewer* v. *Ambrose*, 3 *B. & C.*, 746; *Friedlander* v. *London Ass. Co.*, 4 *B. & Ald.*, 195; *Lawrence* v. *Barker*, 5 *Wend.*, 305; *Bradley* v. *Ricardo*, 8 *Bing.*, 57; *Jack-*

*son* v. *Leek*, 12 *Wend.*, 105 ; *Stockton* v. *Demuth*, 7 *Watts*, 39 ; *Brown* v. *Bellows*, 4 *Pick.*, 179 ; *Rice* v. *N. Eng. Mar. Ins. Co.*, 4 *Pick.*, 439.)

3. The subsequent admission of the testimony of the witness before the coroner in evidence, did not cure the error excepted to; if she had been compelled to account upon the stand for the discrepancy between her testimony on the two occasions, it could not have failed to elicit the truth in regard to what took place between her and her husband at the very instant preceding the homicide, which produced the temporary frenzy under which he acted.

4. Without such testimony, forming strictly a part of the very *res gesta*, the case is entirely without evidence showing any cause or motive for the act.

5. The witness had given affirmative declarations injurious to the prisoner, inconsistent with her previous declarations, which were favorable to him.

6. The question was certainly proper, as tending to refresh the recollection of the witness.

V. The court below erred in not allowing the question to be put to Annisetto Lajeunechette as to his informing Sanchez of his wife's infidelity to him.

1. The theory of the defence being that the act was committed in an insane frenzy, which would, at least, reduce the offence from murder to manslaughter, the causes which produced that frenzy, were, properly, matters of evidence in regard to his condition of mind, in the same manner as intoxication, or any other condition of the man depriving him of the power of knowing what he does, may properly be inquired into in reference to the *design* with which the act was perpetrated. (*The People* v. *Eastwood*, 4 *Kern.*, 562 ; *Swan* v. *State*, 4 *Humph.*, 136.)

2. The fact that the prisoner killed the innocent and unoffending father, with whom he had no quarrel, and against whom he bore no malice, affords additional support to the argument, that the act was committed in an insane frenzy, caused by the sudden communication of his wife's infidelity.

VI. The court below erred in not allowing the question to be put to Tibulcio Aguillar—as to his informing Sanchez of his wife's infidelity to him.

VII. The court below erred in not allowing the question to be put to Tibulcio Aguillar, as to previous statements of facts, made by Annisetto Lajeunechette, differing from those made by him on the stand, by which the defence was taken by surprise.

VIII. The court below erred in not allowing the question to be put to Dr. Ranney, as to his doubts in respect to the prisoner's mental capacity to form a premeditated design to take away life.

1. This was a question involving the prisoner's state of mind at the time of the homicide, and was based as well upon a physiological examination made by the witness as to his mental temperament, as upon the facts of the case. It bears directly upon the question, what effect a strong exciting cause would produce upon his mind, and upon the question, whether the homicide was murder or manslaughter.

2. The witness was an expert, who had made a careful examination as to Sanchez's state of mind, and had heard part of the testimony.

3. It was decided in *The People* v. *Freeman* (*4th Denio*), that if there be a doubt as to a prisoner's sanity, he is not in a fit state to be put upon his trial. *A fortiori* then, *doubts* of experts as to the mental capacity of a prisoner to form a premeditated design at the time of the homicide, ought to go to the jury.

4. The course of examining experts, both as to the results of their own interviews with the prisoner, and upon the testimony evolved in the trial, in respect to the question of insanity, is sanctioned in the following cases: *Lake* v. *The People*, 1 *Park. Cr. R.*, 495; *The People* v. *Thurston*, 2 *Park. Cr. R.*, 49; *see also the Answer of the English Judges on this point, cited in* 3 *Greenl. on Ev.*, § 5.

5. The defence had introduced this course of examination, the prosecution making no objection, and it was not competent for the prosecution to interrupt it, after once assenting to it.

*Nelson J. Waterbury* (District Attorney), for the People.

1. The test of the sufficiency of an indictment is whether or not it describes the offence charged so as to constitute the crime, as defined by law, and to this end every particular or feature of the crime, as so defined, must be set forth with precision, certainty and consistency, and the whole must fully describe the offence. If this is done so as to present a complete description of the offence, as defined by law, or, in other words, so as to insure " the formality of the indictment," the indictment is good, and neither an omission, in a case of homicide, to allege any of the means by which the crime was accomplished, as, for instance, the manner of holding the weapon, nor any deficiency in the description of the wound, nor a variance between the averments of the indictment and the proof to sustain it, unless by the variance the particular species of the crime proved, though it may nevertheless be of the same general character, differs from that described, or unless the accused is misled thereby, is fatal to a conviction. (*Com.* v. *Haines*, 6 *Penn. Law J.*, 232.)

1. *Means of death.* If the variance does not show a difference of operations in the means, it is immaterial. Proof of a wound by a sword, or perhaps, in this State, by a pistol, will support an averment of one by a knife; and a blow by a stone, an averment of one by a stick; but an averment of a wound by a stick or stone, will not permit proof of one by a knife or pistol. So, also, proof of death by one kind of poison, will support an averment of a different kind of poison, though proof of death by starving will not support an averment of poisoning. (*R.* v. *Briggs*, 1 *Moody C. C.*, 322; 2 *Hale P. C.*, 185; 1 *East. P. C.*, 341; 3 *Hawk. P. C.*, 330, § 84, cap. 25; *Arch.*, 484, 485; *Whar. Cr. L.*, §§ 1059–62; 3 *Chitty Cr. L.*, 734–736; 1 *Stark. C. P.*, 91, 92; 1 *B. & B.*, 473; 1 *Russ. on Cr.*, 467; *Rosc. Cr. Ev.*, 577, 578; *People* v. *Colt*, 3 *Hill*, 432; 5 *Car. & P.*, 128; 7 *Car. & P.*, 788.)

2. *Location of wound.* The widest variance between the indictment and proof, in this respect, is immaterial. The wound

may be described on one part of the person, and proved to be on an entirely different part. It may be laid as upon the right temple, and proved to be upon the left; or as through the heart, and proved to be through the head. (2 *Hale's P. C.*, 185, 186; 1 *East. P. C.*, 342, 343, § 110; *Arch. P. L.*, 485, 486; *Whar. on Hom.*, 274; *Dias* v. *State*, 7 *Blackf.*, 22; *Lazier* v. *Com.*, 10 *Grat.*, 715.)

3. *Dimensions of wound.* These need not be averred at all, but if described, any variance is immaterial. (*Rex* v. *Mosely*, 1 *Moody C. C.*, 98; *Lex* v, *Tomlinson*, 6 *C. & P.*, 370; *Lazier* v. *Com.*, 10 *Grat.*, 708; 1 *Lewin*, 177; *Stone* v. *State*, 12 *Scammon*, 326; *Bennett & H.*, 58; *Whar. C. L.*, 1069.)

II. The location of the wound is described in the indictment with sufficient precision. It was held in past centuries that the spot where the wound was made must be so described that it could be pointed out from the description by the finger; but this rule has been gradually relaxed in the progress of legal science, until now, in England, by statute, a simple allegation of the fact of the murder is sufficient. (*Waterman's Arch.*, 206.)

III. The use of the word "body," in pleadings, to describe a particular part of the human system, has been fully established by authority and precedents. (*Hawk. P. C., cap.* 23, § 80; *Long's case*, 5 *Coke R.*, 121; *Chitty's Cr. L.*, 3d vol., 736; *Train & Heard's Prec. of Ind.*, 268; *Rex* v. *Mosley*, 1 *Moody*, 103; *People* v. *Restell*, 3 *Hill*, 291; *People* v. *Stockham*, 1 *Park. C. R.*, 424; *Lake* v. *People*, 1 *Park. C. R.*, 498, 499; *State* v. *Bullock*, 13 *Ala.*, 413.)

IV. If the use of the word "body" as the location of the wound, was a demurrable defect, it would be one of form only, and would, especially after verdict, be cured by the statute of jeofails. (2 *R. S.*, 728, § 52; *People* v. *Powers*, 2 *Seld.*, 50; *People* v. *Phelps*, 5 *Wend.*, 18–20; *People* v. *Warner*, 5 *Wend.*, 271; *People* v. *Rynders*, 12 *Wend.*, 431, 432; *Briggs* v. *People*, 8 *Barb.*, 550, 551; *People* v. *Golden*, 3 *Park. C. R.*, 330; *People* v. *Treadway*, 3 *Barb.*, 470.)

V. At common law, also, it has been held that a verdict will not be disturbed by reason of an uncertain, or even repugnant statement of the offence in the indictment. (*Penn* v. *Bell, Arch. Pl.*, 486; *Addison*, 168, *et seq.*)

VI. Numbers in indictments are unimportant. Whatever may be alleged, one mortal wound must be proved, and no more is necessary. If two are proved, the case, certainly, is not weakened.

VII. If the objection that two wounds are proven, when only one was alleged, were material, it could not be taken advantage of upon a motion in arrest of judgment, which is founded solely upon the record. (*Rex* v. *Spiller*, 5 *C. & P.*, 334; *Stone* v. *People*, 2 *Scam.*, 326.)

VIII. Objections to indictments founded upon a specification in respect to wounds, are only available on a motion to quash. (*Stone* v. *People*, 2 *Scam.* 326; *Rex* v. *Spiller*, 5 *C. & P.*, 334.)

### COMPETENCY OF JUROR.

I. No exception could properly be taken to the competency of the juror, Tuthill. He had been challenged for principal cause, been found competent, and been so declared, without exception. The challenge for favor being, by consent, tried by the court, and there being no objection to any question put to the juror, the finding of the court, being solely upon a question of fact, was final, and not subject to exception or review. (*Ex parte Vermilyea*, 6 *Cow.*, 555; *People* v. *Vermilyea*, 7 *Cow.*, 108; *The People* v. *Bodine*, 1 *Denio*, 308, 309; *Freeman* v. *The People*, 4 *Denio*, 34.)

II. If an exception was allowable, as upon a question of law, it could not be sustained, for the juror was clearly competent. A "preconceived idea," which the juror subsequently explained to be, as meant by him, synonymous with "impression," but which by proper construction is merely a "notion," does not disqualify. The rule is well settled, that the action of the mind of a proposed juror, must have extended to the formation of an opinion, to render him incompetent. (*People* v.

*Honeyman,* 3 *Denio,* 121, *et seq.; Freeman* v. *People,* 4 *Denio,* 34, 35; *Cancemi* v. *People,* 16 *N. Y. R.,* 504, 505.)

### EXCEPTIONS TO EVIDENCE.

I. The exception to the exclusion of the question propounded to the witness, Annisetto Lajeunechette, was not well taken.

1. Testimony in relation to the infidelity of the prisoner's wife, if any were possible, could have no legal bearing upon the question of his guilt in the murder of her father.

2. If proof of a communication to the prisoner, impeaching the fidelity of his wife, could have had any proper influence in determining the grade of the offence for which he was tried, the question should have been limited to a period of time immediately preceding the murder. (*R.* v. *Fisher,* 8 *Car. & P.,* 182; *R.* v. *Kily,* 2 *Car & Kir.,* 815.)

II. The refusal of the court to allow the witness, Sarah Jane Sanchez, to be examined on behalf of the prisoner relative to her testimony at the coroner's inquest, was manifestly just and proper.

1. The witness was called and sworn for the prisoner, and no rule is better settled than that a party is not entitled to impeach his own witness by any testimony, having only that object. (*Cow. & Hill's Phil. Ev.,* n. 604, *and cases there cited;* 1 *Green.,* § 442; *Ewer* v. *Ambrose,* 3 *Barn. & Cress.,* 749, *et seq.*)

2. The refusal to allow the proposed question, worked no injury to the prisoner, because all the testimony at the coroner's inquest was put in evidence by consent, and if the question had been wrongly excluded, the error would be cured by the fact that the previous evidence of the witness was subsequently read to the jury. (*Stephens* v. *People,* 19 *N. Y. R.,* 570, 571.)

3. The testimony sought by the question was wholly immaterial to the issue to be tried.

4. If the object of the question was to refresh the recollection of the witness, its allowance was within the discretion of

the court, and no exception can properly be taken to its exclusion.

III. The question propounded to Dr. Moses H. Ranney was entirely unwarranted, and the exception to its exclusion is not well taken.

1. The question was put upon direct examination, and it was necessary to prove opinions and not doubts. Jurors may have doubts upon the testimony given, but witnesses should not state doubts, or else we might have doubts piled upon doubts.

2. If the opinion of the witness was desired, that could only be asked for upon a given state of facts, and not upon part of the testimony, as heard by him, to which he may have attached a degree of credit which the jury would not, or which he would not, if he heard the whole. (*Lake* v. *People*, 1 *Park. C. R.*, 495; 3 *Green. Ev.*, § 5; *McNaughton's Case*, 10 *Clark & Fin.*, 210; *Vide* 2 *Green. Ev.*, n. to § 373; 1 *Mood. & Rob.*, 75; *Com.* v. *Rogers*, 7 *Met.*, 500.)

3. The question was not confined to the matters upon which the witness was an expert, but the subject of it involved both legal and medical science; and therefore the question could not be put in any form unless its scope was restricted.

4. The point as to whether or not a premeditated design to take life, can instantaneously precede a fatal blow, is one of law, and in respect to this, the answer of the witness to the question immediately previous, shows that he was at variance with the Court of Appeals. (*People* v. *Clark*, 3 *Seld.*, 394.)

IV. The question propounded to the witness Tibulcio Aguillar, was manifestly wrong, and was properly excluded.

1. If the object was to impeach the credibility of the previous witness, Lajeunechette, he was a witness for the prisoner, and it could not be done.

2. If the object was to impeach his testimony, it would have been necessary to lay a foundation by asking Lajeunechette if he had made such a statement. (*Palmer* v. *Haight*, 2 *Barb.*, 210; *Everson* v. *Carpenter*, 17 *Wend.*, 429; *Pendleton* v. *Empire Stone Dressing Co.*, 19 *N. Y. R.*, 13.)

3. If the object was not to impeach Lajeunechette, the evidence was hearsay, and therefore inadmissible.

4. More especially the virtue of the prisoner's wife was not to be impeached by the braggart boasts of a third party, made to another stranger; and there was not a single word of evidence during the whole trial throwing even a doubt upon her fidelity to him.

5. The evidence sought was, under any circumstances, immaterial to the issue to be tried.

6. If it was material, and otherwise allowable, it could not be proper unless connected with a further statement or other proof that the prisoner had knowledge of the fact previous to the murder.

V. The question proposed to the witness Tibulcio Aguillar, was properly excluded.

1. The testimony sought was entirely hearsay.

2. It was, in any point of view, wholly immaterial to the issue to be tried.

3. If it was material, it would have been necessary to limit any such statements as those sought, to a period of time immediately preceding the murder.

*By the Court,* ROOSEVELT, J.   The prisoner, Sanchez, was convicted, at a Court of Sessions, of the crime of murder, in taking the life of one Curnon, his wife's father, on the 6th of January last, at 154 Sullivan street, in the city of New York, by stabbing him with a sword through the lungs, in a manner which, according to the testimony, must have produced instantaneous death.

Before the execution of the sentence, a writ of error was sued out by the prisoner, to bring the proceedings into the Supreme Court for review, in pursuance of the recent statute in relation to capital convictions in the Court of Sessions of this city, which gives to parties in such cases a right to a new trial, if the Supreme Court shall be satisfied that the verdict was against the weight of evidence or against law, or that jus-

tice requires a new trial, whether any exception shall have been taken or not in the court below. (*Laws* 1855, 613.)

Several exceptions, however, were specifically taken at the trial, and are still insisted on as grounds for reversal.

It was contended, among other objections, that the indictment was defective in not specifying the part of the body in which the wound was inflicted, and in stating only one wound to have been given, instead of two.

The object of an indictment is to give to the prisoner reasonable notice of the crime with which he is charged, so that he may be enabled to prepare his defence, and also to protect him, if necessary, from a second trial for the same offence, by showing from the record the identity of the two accusations.

This indictment describes the stab as made by a sword " in and upon the body " of Curnon, inflicting upon his body " one mortal wound, of the breadth of one inch, and of the depth of three inches," of which he " instantly died." The term body, in such a connection, clearly means only that part of the human frame to which the head and limbs are attached. Of what consequence is it, whether the wound was given to the left side or to the right side, below the fifth rib or above the fifth rib, or whether there were two wounds or one, if both or either were mortal? That these minute particulars are not matters of substance, is evident, from the well established rule that, if averred one way in the indictment, they may be proved another way on the trial. To test the objection, let us suppose that the wound, instead of three inches in depth, had turned out to be two inches and three-quarters, would the legal consequence have been an acquittal? Even the musty records of antiquity furnish no authority for such a proposition. If they did, we should not feel ourselves compelled to follow it. The common law is a progressive science, and one of its leading attributes is adaptation to the circumstances and spirit of the age, and to the common sense of the people, of whose actions it is made the rule, and of whose will it is the presumed exponent. The statute, too, admonishes us to disregard the mere cobwebs of former days. " No indictment shall be

Sanchez *v.* The People.

deemed invalid, &c., by reason of any defect or imperfection in matters of form, which shall not tend to the prejudice of the defendant."

That the defendant did not consider himself prejudiced, or likely to be prejudiced, by the alleged uncertainty of this indictment, is shown by the fact, that instead of demurring, he went to trial upon it, and had no consciousness of the supposed error until after the verdict of guilty had been pronounced, and he was instructed by his counsel to move in arrest of judgment.

There are many objections which may be taken before, that cannot be taken after verdict. And the law on that point is the same in criminal as in civil cases.

The next suggestion relates to one of the jurors, who, being challenged, said that " he had read part of the statements in the papers at the time of the homicide, and had formed a preconceived idea in regard to the prisoner's guilt or innocence, but had no bias one way or the other; that his preconceived idea or impression would in no way influence his verdict, but would be governed entirely by the evidence produced on the stand."

The court below admitted the juror to be qualified, and it is quite obvious that if jurors are on such grounds to be rejected, it will be impossible at the present day to administer justice in cases sufficiently exciting to inspire a newspaper paragraph. Every male adult, over twenty-one and under sixty, " in possession of his natural faculties, and not infirm or decrepit, of sound judgment and well informed " (and no other can be a juror), must read the news of the day, and must, from such reading, form some " idea or impression." If an idea or impression, therefore, is to be a disqualification, no competent juror, at the present time, can be found; for no man, in a land of newspapers, can be " well informed " without reading; or, with a "sound judgment," can read without receiving an "idea or impression."

The case of *Cancemi*, when last under review in the Court of Appeals, involved two propositions, one relating to the

alleged improper allowance of a juror, and the other to the erroneous charge. All the judges agreed that there was error in the charge, but all did not agree, nor was it necessary to the result that they should, that the juror was improperly admitted. In other words, all agreed in the propriety of a new trial, some on one ground, some on the other, and some on both. The decision, therefore, can hardly be considered as a controlling authority on either of the questions referred to—certainly not to support the proposition for which it is cited in the present case. In its strongest aspect, it went no further than to hold that a juror who had both "formed and expressed an opinion," which was so fixed that it would require affirmative evidence to dislodge it, was not qualified to sit as an impartial umpire between the people and the prisoner. The case of Cancemi, therefore, although it illustrates, does not dispose of that of Sanchez, and we think the principle contended for will be found so embarrassing in practice that it should rather be restricted than extended.

To understand the other points discussed by the prisoner's counsel, a brief statement of facts is necessary: Sanchez, it appears, only a few weeks previous to the homicide, had been married to Curnon's daughter, and had taken up his residence in the same house with his father-in-law. The family consisted of Mr. and Mrs. Curnon, their two daughters, and Sanchez. On the night in question, he had possessed himself, for what reason does not appear, of Curnon's sword-cane, or rather of the sword drawn from the cane, and, with his wife, was in the room of his father-in-law, the old people being below in the basement. Mrs. Curnon says:

My husband and I proceeded up stairs to go to bed, and found the door of the parlor, which was the room in which my husband and I slept, locked; I saw Sanchez standing by his bedside, as I looked in through the small window at the head of the stairs; I said, "Feely, open the door," which I repeated three times, but he made no reply; I then spoke to Sarah Jane, who was sitting up in the bed, and said, "Sarah Jane, open the door," to which she answered, "He won't let me;"

I put my hand to the door and gave it one shove, and it flew open, which forced me into the room; my husband must have followed me; there was no one there but Sanchez, who bounded out of the bedroom as I came in the door; he rushed upon me, and stabbed me with a sword which he held in his hand; then Sarah Jane jumped out of the bed and passed him; he turned quick and gave her a stab in the shoulder; he then turned upon my husband; I saw my husband's hand raised; I saw Sanchez make a plunge at him with the sword-cane; I saw but one blow; in the morning I saw my husband lying dead on the floor, &c.

Here would seem to have been, in the common acceptation of the term, no "premeditated design to effect the death of the person killed," but still the act may be murder. Killing, says the statute, shall be deemed murder "when perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.(a) Whoever recklessly uses a murderous weapon, is, in law, responsible for the consequences. The law does not regard the want of inadequate motive as a mitigation or justification, or as evidence of that species of insanity, which makes the perpetrator an irresponsible machine. Mere jealousy, like hatred or malice, may explain, but cannot excuse, the wanton disregard of human life. The object of penalties is to compel men to control their depraved minds, and to teach them not to yield to frenzied passion. In this view, what defence could it be to say that some person had told the prisoner—falsely, as appears—that his wife had been unfaithful? The rumor communicated to the injured husband might inflame passion, but, in the case of a "dangerous weapon," would have no tendency to show any absence of "design to effect death," so as to reduce the crime from murder to manslaughter. More especially was

(a) *Sed vide, Darry* v. *The People* (2 *Park. Cr. R.*, 606), as to the inapplicability of that subdivision of the section to a case of homicide resulting from a direct assault of one person upon another.

the inquiry irrelevant when the person killed, instead of being the alleged adulterer, was the father of the wife.

Is a husband, on being told of his wife's supposed infidelity, to seize a dagger, and on the instant commence stabbing every person that comes near him, and then to quote the monstrous atrocity of the act, in connection with such rumor, true or false, as evidence of insane frenzy? We think not—and that the question objected to by the public prosecutor, although it might as well have been allowed, was lawfully overruled, and that no injustice has been done by its exclusion.

The same remark applies to several other questions which were excluded by the court below.

A point has been raised as to the testimony of the prisoner's wife, who, by consent, was permitted to be sworn on his behalf, but who, when sworn, stated that her husband did not accuse her of any improper intercourse. This statement being sought to be contradicted by her answers before the coroner, the District Attorney objected to the question, on the ground that a party cannot impeach his own witness. Such, undoubtedly, is the rule of law. There was, therefore, no legal error in the exclusion. And as to any supposed injustice, it was sufficiently obviated by the subsequent admission of all the proceedings had before the coroner, and among them the following statement:

My husband accused me of having improper intercourse with a man named Annisetto Lajeunechette, and threatened that unless I told the truth he would stab me; he accused me of being a prostitute; I was sitting up in bed crying at the time; my mother knocked at the door on account of his remarks; I heard her burst in the door.

So that if the defendant's own witness had in fact contradicted herself, both the versions given by her were submitted to the jury, to be weighed as they might deem proper. Which of the two they believed does not appear; but neither, it is clear, warranted, or was deemed to warrant, a verdict of acquittal or of manslaughter.

Sanchez *v.* The People.

The result is:

First. That the indictment, in the particulars excepted to, was sufficient, or that its defects, if any, were merely formal and were cured by the statute of amendments and by the verdict.

Second. That the juror objected to, being impartial, within the meaning of the law requiring jurors to be persons "of sound judgment and well-informed," was properly allowed to be sworn.

Third. That whether information of his wife's alleged infidelity was communicated to the prisoner or not, and whether such information, if communicated, was true or not, was an immaterial inquiry, as it in no way tended to justify the homicide, or to reduce its grade from murder to manslaughter.

Fourth. That neither the evidence excluded, nor the evidence received, had any tendency to show legal insanity, or to exempt the perpetrator of the homicide from responsibility for his acts.

Fifth. That the heat of passion, where there is a design to effect death by a dangerous weapon, is no excuse in law, or palliation of the act, although not premeditated and not directed against any particular individual, if the act evinces a depraved mind and a reckless disregard of human life.

Sixth. That as, therefore, there was no legal error in the rulings of the court below, and tested by the statute "of crimes punishable with death," no injustice in the verdict of the jury, the application for a new trial must be denied, and the judgment affirmed.

Judgment affirmed.